# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF WASHINGTON

John Thomas Entler,
_____
(Name of Plaintiff)

vs.

Roy Gonzalez, and Belinda D.
_____
Stewart,
_____

(Names of Defendant(s))

**C17-5407RBL/JRC**

**CIVIL RIGHTS COMPLAINT BY A PRISONER UNDER 42 U.S.C. § 1983** & RLUIPA COMPLAINT UNDER 42 U.S.C. § 2000cc et.seq. Declaratory Relief 28 U.S.C. § 1343, 28 U.S.C. § 2201-2202 COMPLAINT AND INJUCTIVE RELIEF

## I. Previous Lawsuits:

A. Have you brought any other lawsuits in any federal court in the United States while a prisoner?:

☒ Yes        ☐ No

B. If your answer to A is yes, how many?: ___19-20___. Describe the lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper using the same outline.) see page 2, §3.1 in Attached complaint.

1. Parties to this previous lawsuit:

Plaintiff: See page 2, §3.1 in attached complaint.
_____

Defendants: see page 2, §3.1 in attached complaint.
_____

2

2. Court (give name of District): _See page 2, §3.1 in attached complaint_

3. Docket Number: _See page 2, §3.1 in attached complaint._

4. Name of judge to whom case was assigned: _See page 2, §3.1 in attached complaint._

5. Disposition (For example: Was the case dismissed as frivolous or for failure to state a claim? Was it appealed? Is it still pending?):
_See Page 2, §3.1 in attached complaint._

6. Approximate date of filing lawsuit: _See page 2, §3.1 in attached complaint._

7. Approximate date of disposition: _See page 2, §3.1 in attached complaint._

**II. Place of Present Confinement:** _See pages 2, §4.1 in attached complaint_

A. Is there a prisoner grievance procedure available at this institution?    ☒ Yes    ☐ No

B. Have you filed any grievances concerning the *facts* relating to this complaint?
☒ Yes    ☐ No

      If your answer is NO, explain why not:

| N/A | N/A |
| --- | --- |
| ↓ | ↓ |

C. Is the grievance process completed?    ☒ Yes    ☐ No

**If your answer is YES, ATTACH A COPY OF THE <u>FINAL</u> GRIEVANCE RESOLUTION for any grievance concerning facts relating to this case.**

    See Attachment 2, in attached complaint.

**III. Parties to this Complaint**

A. Name of Plaintiff: _See p. 2, §41 in attached complaint_ Inmate No.: _964471_

Address: _See p. 2, §4.1 in attached complaint_

(In Item B below, place the full name of the defendant, his/her official position, and his/her place of employment. Use item C for the names, positions and places of employment of any additional defendants. Attach additional sheets if necessary.)

B. Defendant: _See p. 3, §4.2 in attached complaint_ Official Position: _Id._

Place of employment: _See p. 3, §4.2 in attached complaint_

C. Additional defendants  see p. 3, §4.2 in attached Complaint

## IV. Statement of Claim

(State here as briefly as possible the <u>facts</u> of your case. Describe how each defendant is involved, including dates, places, and other persons involved. <u>Do not give any legal arguments or cite any cases or statutes</u>. If you allege a number of related claims, number and set forth each claim in a separate paragraph. Attach additional sheets if necessary.)



SEE PAGES 3-9, §§5.1--5.25 IN ATTACHED COMPLAINT

SEE ALSO PAGES 9-10, §§6.1--6.6 IN ATTACHED COMPLAINT

4

**V. Relief**

(State briefly exactly what you want the court to do for you. Make no legal arguments. Cite no cases or statutes.)

SEE PAGES 10-11, §§ 7.1 --7.5 IN ATTACHED COMPLAINT.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 23rd day of _____ may _____ 20 _____ .



(Signature of Plaintiff)

5

UNITED STATES DISTRICT COURT FOR THE WESTERN

DISTRICT OF WASHINGTON

AT TACOMA

| | |
|---|---|
| John Thomas Entler, ) | |
| Plaintiff, ) | NO. |
| ) | CIVIL RIGHTS COMPLAINT |
| vs. ) | UNDER 42 U.S.C. § 1983 AND |
| ) | COMPLAINT UNDER 42 U.S.C. |
| Roy Gonzalez, and ) | § 2000 cc et. seq. (RLUIPA) |
| Belinda D. Stewart, ) | |
| Defendants. ) | |

## I. INTRODUCTION.

1.1 Comes Now, John Thomas Entler, Plaintiff in the above-entitled matter and submits this Complaint under 42 U.S.C. § 1983 and 42 U.S.C. § 2000cc- et seq. against Prison officials.

## II. JURISDICTION & VENUE.

2.1 The above-entitled Court has jurisdiction over the claims presented herein under 42 U.S.C. § 1983 and

Complaint
Page 1 of 12

42 U.S.C. § 2000cc-2; 28 U.S.C. § 1343; 25 U.S.C. §§ 2201-2202 (Declaratory Relief), and this Court has venue under 28 U.S.C. § 1391 (b), because the named Defendants who made the decisions under review reside in the Western District of Washington, and the decisions by Defendant's were made in the Western District of Washington.

## III. PREVIOUS LAW SUITS.

3.1  Mr. Entler concedes that he has "three-strikes" under 28 U.S.C. § 1915 (g) as that Statute is currently con-strued. See <u>Entler v. Gregoire</u>, et. al., Dist. Ct. Wash. (EST), No. CV-12-5141-JPH, at Dkt. #25. However, Mr. Entler seeks IFP Status under 28 U.S.C. § 1915 (g)'s "immen-ant danger of serious physical injury," because Defendant's are currently disclosing Mr. Entler's cur-rant Criminal information to other prisoner's on the "Prison Law Library Computers", and defendants Know that other prisoners will use Mr. Entler's Current cri-minal information to target him for assaults. See Claim No. 1. below.

## IV. PARTIES.

4.1  <u>Plaintiff</u>: John Thomas Entler, is currently confi-ned at the Washington State Penitentiary, 1313 N. 13th Ave. Walla Walla, WA. 99362.

4.2 <u>Defendants</u>: <u>Roy Gonzalez</u> is a Department of Corrections (DOC) manager at DOC Headquarters located at 7345 Linderson Way S.W., Tumwater, Wa. 98501; <u>Belinda D. Stewart</u> is a DOC Corrections program Manager (CPM) at DOC Headquarters, located at 7345 Linderson Way S.W., Tumwater, Wa. 98501.

## V.  FACTS RELATING TO THE COMPLAINT.

### A. <u>FACTS RELATING TO CLAIM NO. 1:</u>

5.1  On December 17, 2015, a Lexis Nexis Computer System was put in the South Complex Law Library that has 25 personal computer terminals, at the Washington State Penitentiary. (WSP).

5.2  The Lexis Nexis System provides other prisoners with other prisoners criminal cases such as rape, child molestation, and other similar crimes against children.

5.3  The Lexis Nexis System provides "unpublished" and "published" cases, when the prior West Law System only provided access to "published cases".

5.4  All of Mr. Entler's cases discussing his criminal convictions are unpublished cases.

5.5  Defendant Roy Gonzalez knows that other prisoners will use the information in § 5.2 to target other

Complaint
Page 3 of 12

prisoner's, such as mr. Entler, with rapes, assaults, as well as to coerce other prisoners into fights, yet Defendant Roy Gonzalez allows other prisoners to have access to the information contained in ¶ 5.2.

5.6 mr. Entler asks this court to take judicial notice of Defendant Roy Gonzalez's Declaration in <u>Entler v. U.S. Dist. Ct., Est. Wash.</u>, No. 16-cv-05124-TOR, at Dkt. #1, (at Exhibit 2, at p. 3, ¶ 5; Exhibit 3, at pp. 1-2 (Part B Level III. Response), where Defendant Gonzalez recognizes what other prisoners will do with such information.

5.7 Dispite the risk as discribed in ¶¶ 5.5 & 5.6, and dispite Defendant Roy Gonzalez's knowledge of what other prisoners will do with such information, such as mr. Entler's, Defendant Roy Gonzalez is deliberately indifferent to mr. Entler's safety and is failing to protect mr. Entler within DOC.

5.8 Defendant Roy Gonzalez has the authority to take mr. Entler's criminal unpublished cases off of the Lexis Nexis System, but refuses to do so even after mr. Entler has exhausted his prison administrative remedies. See Attachment 2, at

5.9 Defendant Roy Gonzalez's actions stated in ¶¶ 5.1 - 5.8, are not reasonable under any circumstances because: <u>(1)</u> his actions constitute a

Crime under Washington State's Criminal Code (i.e.,
RCW 9A.76.150(1) & 9A.76.160(1) Introducing Contraband
in the 2nd & 3rd degrees); (2) his actions violate Doc's
Policies that prohibit prisoners from having access to
other prisoners legal information (see¶5.6); (3) his
actions violate RCW 72.09.530 (Restrictions on Contra-
-band); and (4) No reasonable DOC official would
have allowed prisoners access to this information.

   5.10  Defendant Roy Gonzalez has a duty to pro-
-tect Mr. Entler under the 8th Amendment because
of a "Special relationship" exists, and Defendant
Roy Gonzalez has engaged in conduct contrary to
that special relationship.

B. FACT RELATING TO CLAIM NO. 2:[1]

   5.11  Mr. Entler has a personal g-mail account at
"galhenmelchizedek@gmail.com."

   5.12  Mr. Entler can be infracted and prosecuted
for possessing a computer not authorized by DOC. See
Sutton v. Pacholke, 2013 U.S. Dist. Lexis 80485 (W.D. Wash.
may.9, 2013)(Infracted for possession and unauthor-
-ized cell phone); RCW 72.09.530; RCW 9A.76.150(1) &

NOTE NO. 1: Mr. Entler incorporates by reference the attach-
-ed "Statement of material facts" as fully re-in-stated
herein, for all intents and pupurposes to his claim.

Complaint
Page 5 of 12

RCW 9A.76.160(1) (Introduction of Contraband)). See also In re Personal Restraint of Norman, 2013 Wash. App. Lexis 2563 (Div. 1, Oct. 28, 2013) (Infraction for unauthorized use of computer); Schiefer v. United States, 2013 U.S. Dist. Lexis 34862 (S.D. West. Va., Feb. 7, 2013) (Inmate infracted for unauthorized use of computer to update profile on Facebook).

5.13  DOC provides prisoners with a JP-7 player that has a Universal Serial Bus (USB) port or similar drive capabilities.

5.14  DOC provides prisoners with a JP-7 player that has the capability to display photographs, images, videos, and motion picture capabilities.

5.15  DOC can provide "Internet access" through it's existing television cable system, through a "cable modem service" or a "Cable Service Provider."

5.16  Other similarly situated individuals in Civil Commitment Facilities are authorized access to the internet and can possess personal computers in their cells under Revised Code of Washington (RCW) 71.09.080(1), when Civil Commitment Facilities and DOC Facilities face the same security and safty Policies, goals, and legitimate interests in limiting access to personal computers and access to the internet.

Complaint
Page 6 of 12

5.17 Doc can use a "FortiGuard" Filter Software, or other similar devices to limit the web-sites that Mr. Entler is allowed access to on the internet.

5.18 Doc can use a "FortiGuard" Filter Software or similar devices to allow Mr. Entler to have access to his g-mail, without violating any of Doc's legitim--ate penological interest, objectives, or goals.

5.19 Doc can allow Mr. Entler to have access to his g-mail under the supervision of the Facility Chaplain, without direct access to the internet.

5.20 Mr. Entler entends to use his g-mail to express his religious beliefs and to provide his religious art--icles to share with the general public, "proselytize."

5.21 Mr. Entler intends to use his g-mail to estab--lish his church on the internet, and RCW 72.09.530 requires Doc, when promulagating Contraband Pol--ices, to promulagate their policies while also pro--tecting prisoner's rights to share their ideas with the general public.

5.22 Doc does not allow Mr. Entler access to his g-mail to "proselytize" and share his religious beliefs with the general public.

5.23  Mr. Entler's religion ("Essene Religion") requires him to proselytize by teaching the "Gospel of Melchizedek" to the world, and is a sincer exercise of his religion that is being substantially burdened by Defendant Belinda D. Stewart, by DOC's prohibitions in ¶¶ 5.12, 5.16, and 5.22. See Attachment 1, at pp. 18-19. Mr. Entler has to be a disciple as ordered.

5.24  Mr. Entler's sincerely held  religious exercise is being substantially burdened by DOC's "no personal computer" no "internet access" for the reasons stated in ¶ 5.12, for exercising his sincerely held religious activities in ¶¶ 5.20-5.23.[2]

5.25  As demonstrated in ¶¶ 5.15 - 5.19, DOC is not using the "least restrictive means" of furthering any legitimate penological interests, objectives, or goals, in prohibiting Mr. Entler from having a personal computer and access to his g-mail. This is so dispite giving no reason what so ever why DOC will not allow access to a personal computer and to the internet, nor that they considered or rejected other less restrict-

Note No. 2: Mr. Entler is a "Messianic Essene", substantially similar to "Messianic Jews", and are better known as the religious sect that possessed the "Dead Sea Scrolls." The Essenes converted to Christianity when Jesus (Yahshua) came and died on the cross. Thus, Essenes are Christians and practice their religion the same as in the Bible, some differences.

Complaint
Page 8 of 12

-ive means, but DOC only gives a cursory denial of Mr. Entler's request for religious exercise. See Attachment 2, at p. 1. See also Attachment 1, at pp. 18-19.

## VI. CLAIMS FOR RELIEF.

### Claim NO. 1:

6.1 Defendant Roy Gonzalez has acted, and continues to act, with deliberate indifference to the serious protection needs of Mr. Entler within the DOC.

6.2 Defendant Roy Gonzalez by his actions and/or omissions, taken under color of state law have vio-lated, and continue to violate, the rights of Mr. Ent-ler to be free from cruel and unusual punishment, guaranteed to Mr. Entler by the 8th Amendment to the United States Constitution. Defendant Roy Gonzalez's constitutional violations are actionable under 42 U.S.C. § 1983.

6.3 Mr. Entler requests an exception under 28 U.S.C. § 1915(g), and is entitled to an exception under said statute. Andrews v. Cervantes, 493 F.3d 1047, 1156 (9th Cir. 2009) (Prior knowledge of Prison officials regarding dangers to a prisoners safety sufficient to meet §19-15(g)'s exception). See ¶¶ 5.5 – 5.7.

Complaint
Page 9 of 12

13

<u>Claim No. 2:</u>

6.4  Defendant Belinda D. Stewart's and Doc's "no personal computer" and "no internet access" policy is not the least restrictive means or burdening Mr. Ent-ler's sincerely held religious beliefs and exercises.

6.5  Defendant Belinda Stewart's and Doc's "no per-sonal computer" and "no internet access" policy is a substantial burden on the exercise of Mr. Entler's sincerely held religious beliefs and exercise.

6.6  Defendant Belinda D. Stewart's and Doc's omis-sions, taken under color of State Law have violated, and continue to violate, Mr. Entler's rights under 42 U.S.C. § 2000 cc §§ 1-2. Defendant Belinda D. Stewart's actions are actionable under RLUIPA.

<u>VII. RELIEF REQUESTED.</u>

<u>Claim No. 1:</u>

7.1  Mr. Entler <u>(1)</u> requests a declaration that Defendant Roy Gonzalez violated his 8th Amendment rights; <u>(2)</u> injunctive relief prohibiting Defendant Gonzalez from disclosing Mr. Entler's criminal infor-mation to other prisoners; and <u>(3)</u> requests punit-ive and compensate damages for being deliberately malicious regarding Mr. Entler's 8th Amendment rights.

<u>Claim No. 2</u>:

7.2  Mr. Entler requests a declaration that Defendant Belinda D. Stewart's "no personal computer" and "no internet access" policies substantially burdens his sincerely held religious beliefs and exercises, and are not the least restrictive means of furthering any legitimate penological interests, objectives, or goals

7.3  Mr. Entler requests injunctive relief against Defendant Belinda D. Stewart's "no personal computer" and "no internet access" policies that substantially burden the sincerely held religious belief and exercise.

7.4  Mr. Entler requests that the court enter an injunction prohibiting the receipt of federal funding until Defendant Belinda D. Stewart provides Mr. Entler access to his g-mail account, unless they make a good faith showing that they are trying to accom-odate Mr. Entler's sincerely held religious beliefs and exercises in accessing his g-mail account.

7.5  Mr. Entler requests that the court maintain it's jurisdiction to impose sanctions on defendant Belinda D. Stewart for contempt, in violating the court order(s) or relief granted in this mat-ter for all-intents and purposes to enforce Mr. Entler's RLUIPA rights.

Complaint
Page 11 of 12

I declare under the penalty of perjury under the laws of the United States that the above is true and correct to the best of my personal knowledge, beliefs, and experiences, and are based on a reasonable investigation of such claims.

Signed this 23rd day of ___May___, 2017.

Signed: _____

John Thomas Entler, #964471

Washington State Penitentiary

1313 N. 13th Ave.

Walla Walla, Wa 99362

Subscribed to and sworn to before me this 23rd day of ___May___, 2017, by John J. Entler.

_____

NOTARY PUBLIC IN AND FOR THE
STATE OF WASHINGTON, RESIDING
AT WALLA WALLA, WASHINGTON
MY COMMISSION EXPIRES:
April 1, 2021.

Complaint

Page 12 of 12

# ATTACHMENT - 1

ATTACHMENT - 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON AT TACOMA

John Thomas Entler,          )
                             )
            Plaintiff,       )        No.
                             )
                             )        STATEMENT OF MATERIAL FACTS
       vs.                   )
                             )
                             )
Roy Gonzalez et al.,         )
                             )
            Defendants.      )

_____

COMES NOW John Thomas Entler, Plaintiff in the above-entitled matter and submits this "Statement of Material Facts," in support of both his "Complaint" concerning his Religious Land Use and Institutionalized Persons Act (RLUIPA) claims under 42 U.S.C. §2000cc et seq., and in support of any "Opposition/Motions" for "Summary Judgment" proceedings.

## I. STATEMENT OF MATERIAL FACTS.

A. Internet Protocol Address.

1. An "Internet Protocol Address" ( or IP address) is a numeric value used to identify the network location of a computer or set of computers on the Internet.

2. Every computer on the Internet needs to have a IP address in order to communicate with other computers on the Internet.

Statement of Material Facts
Page  1  of   22

3. IP addresses are allocated to Internet Service Providers (ISPs) in blocks of consecutive addresses out of a worldwide pool.

4. ISPs can further delegate these addresses to smaller entities such as businesses, Internet Cafes, or smaller ISPs.

5. ISPs can assign an IP address directly to an individual computer.

6. Individual users connect [to the Internet] using different IP addresses depending on where they are.

7. An IP address may identify the network through which a network-enabled device (such as a desktop computer, laptop computer, tablet, or smartphone) is accessing the Internet.

8. When a portable device moves from an Internet connection on one network (the network connection at one's home, for example) to an Internet connection on another network (a local coffee shop), the IP address associated with the portable device changes to reflect that the device is connected to that particular network.

9. Many host computers of Websites, including popular Web-based email services like ... Microsoft Hotmail, maintain logs that list the IP address of visitors along with the date and time information.

10. Websites that utilize a log-in feature typically maintain a log of IP addresses and other data associated with the particular user who logged in, such as the date and time of log-in and the duration of time the user visited the Website.

///

Statement of Material Facts
Page 2 of 22

11. Through online services, [a] user can imput a numerical IP address, which might be an ISP or other entity.

12. When IP addresses have been allocated directly to an organization that makes use of them the online service can sometimes associate an IP address with an exact physical location.

13. On most occasions, however, the service will only associate an IP address with an Internet Service Providers office, which is often in the same region as it's subscribers or users but does not reveal their exact locations.

14. These online services and other sources provide supplementary information about the geographic location where ISPs operate and where they use particular ranges of IP addresses.

15. For instance, the IP address 199.83.220.233 is easily traceable to San Francisco.

16. Where specific information about the physical location of an IP address is lacking, a litigant who possesses a list of IP addresses can subpoena subscriber information from the corresponding ISPs for the specific IP address and develop a detailed picture of a persons location and movements from that subscriber information.

16. Mr.Entler respectfully requests that this Court take "Judicial Notice" of the decision, including the underlying facts in Drummond Co. v. Collingsworth, 2013 U.S. Dist Lexis 163971(Nov. 18, 2013)(citing Declaration of Seth Schone, a senior staff Technologist with the Electronic Frontier Foundation in San Francisco)(quotations and alternations omitted); Chevron Corp., v. Danzinger, 2013 U.S. Dist. Lexis 89205, 2013 WL 3228753, at *2 (N.D.N.Y. June 25, 2013); Chevron

Corp. v. Donzigner, 2013 U.S. Dist. Lexis 119622, 2013 WL 453608, at *2 (N.D.N.Y. Aug. 22, 2013)(also citing declaration of Seth Schone), pursuant to Rosales-Martinez v. Palmer,753 F.3d 890,894(9th cir. 2014);Outdoor Media Grp., Inc. v. City of Beaumont,506 F.3d 895,899(9th cir 2007).

B. Collecting Linkage URLs Locators.

17. Any computer from which a person accesses the Internet is assigned an IP address, which may be either "static" (remain constent) or "dynamic" (change periodically).

18. When a Universal Resources Locators (URLs), or Website name, is typed into Internet-brower software, a network of computers is able to connect a corresponding IP address, permitting the transmission by Internet of various types of information between two addresses.

19. Internet Service Providers (ISPs) have the capability to maintain databases containing a history of the linkages created by such transmissions. Such database is capable of providing the following information:

(a) Where individual subscribers went on the Internet; (b) collect personally identifiable information sent to and from it's Internet subscribers; (c) Web surfing habits; (d) where they visited; (e) information they were provided at Websites; (f) store the history of IP-URL links; (g) information of what it's subscribers viewed, did and entered at the Website they visited; (h) a list of every Website it's Internet subscribers had visited, as well as the power to connect and correlate those online activities with the identity of each subscriber.

20. The Washington State Department of Corrections (WDOC) and any of it's Cable Service Providers can collect this data information on prisoners under 47 U.S.C. §551(2)(A)&(B)(Cable Privacy Act).

Statement of Material Facts                                           1
Page 4 of   22

21. Mr.Entler respectfully requests that the Court take "Judicial Notice" of the decision, and facts in Klimas v. Comcast Cable Communs., Inc.,465 F.3d 271,273(9th cir. 2013), and 47 U.S.C. §551(2)(A)&(B) pursuant to Rosales-Martinez v. Palmer,753 F.3d at 894;Outdoor Media Grp., Inc. v. City of Beaumont,506 F.3d at 899.

C. How Filtering Is Accomplished.

22. The "North Central Reginal Library District" (NCRL) is an inter-county rural library district established in 1960 by the citizens of Chelan, Douglas, Ferry, Grant, and Okanogan Counties, in the State of Washington.

23. NCRL was formed and operates under Revised Code of Washington (RCW) 27.12 et seq. and other statutes applicable to inter-county rural library districts.

24. NCRL maintains twenty-eight (28) branches and serves over 220,000 people, is funded by local property taxes, federal subsidies, private grants, and endowments.

25. NCRL receives federal assistance through the E-rate program, which provides for discounted Internet Access and other telecommunications services, and the Library Services and Technology Act, which provides for grants to public libraries.

26. The Internet is currently an unregulated medium, while the Internet offers access to materials that are enriching to users of all ages, the Internet also enables access to some materials that may be offensive, disturbing, or illegal.

///

Statement of Material Facts
Page  5  of  22

27. There is no guarantee that information obtained through the Internet is accurate or that individuals are who they represent themselves to be.

28. The library district recognizes that it cannot fully control the amount of materials accessible through the Internet but will take reasonable steps to apply to the Internet the selection criteria stated in it's "Collection Development Guidlines and Procedures" (CDGP) policy.

29. All Internet access on NCRL library computers is filtered.

30. The NCRL library district does not host customer e-mail accounts or provide access to chat rooms.

31. Pursuant to the CDGP, public Internet access through the NCRL network is filtered and has been filtered continuously since access began in the late 1990s.

32. NCRL does not and will not disable the filter at the request of an adult patron.

33. Prior to October 2006, NCRL filtered Web content using a software product called "Smartfilter," Bess edition.

34. In October 2006, as part of a comprehensive network and cataloging system upgrade, NCRL replaced it's Smartfilter product with Web-bases Filtering Solutions offered by Fortinet called the FortiGuard Web Filtering Service ("FortiGuard").

35 The FortiGuard Service has two primary components: the FortiGurad Rating Server and the FortiGuard Firewall/Proxy Unit.

Statement of Material Facts
Page  6  of  22

36. FortiGuard Rating Server is a database maintained by Fortinet that catalogues more than 43 million Websites and over two (2) billion individual Webpages.

37. Using a combination of proprietary algorithms and human review, Fortinet sorts sites and pages into seventy-six (76) categories based on predominant content, and also assigns Websites to one (1) of seven (7) classifications based on media types and sources.

38. Any one may request that Fortinet review it's classifications of a particular Website or page by using an electronic form available on the Fortinet site.

39 A FortiGate Unit is installed as each of NCRLs 28 branches.

40. The FortiGuard Unit is an appliance that acts as an intermediary between a user's computer browser and the servers.

41. All Internet traffic to and from NCRLs public use computers is routed through the FortiGate Unit, which filters Web content in accordance with information provided by the FortiGate Rating Server and settings established by NCRL that defines which categories and classifications of Websites to block.

42. If access to a Website or page is denied, the computer user receives a message to that effect.

43. If access to an embedded image is denied, the user receives no message; instead, a blank image is substituted for the blocked image.

44. Some of the Internet site categories that NCRLs FortiGuard filter is configured to block - along with category descriptions

provided by Fortinet are:

(a) HACKING. Websites that depict illicit activities; surrounding the unauthroized modification of access to programs, computers, equipment and websites;

(b). PROXY AVIODANCE. Websites that provide information or tools on how to bypass Internet access controls and browse the web anonymously, including anonymous proxy servers;

(c). PHISHING. Counterfeit Web pages that duplicate legitimate business web pages for the purpose of eliciting financial, personal or other private information from the users;

(d). ADULT MATERIALS. Mature content Websites (18+ years and over) that feature or promote sexuality, strip clubs, sex shops, etc. excluding sex education without intent to sexually arouse;

(e). GAMBLING. Sites that cater to gambling activities such as betting, lotteries, casinos, including gaming information, instruction, and statistics;

(f) NUDITY AND RISQUE. Mature content Websites (18+ years and over) that depict the human body in full or partial nudity without the intent to sexually arouse;

(g). PORNOGRAPHY. Mature content Websites (18+ years and over) which present or display sexual acts with the intent to sexually arouse and excite;

(h). WEB CHAT. Websites that promote web chat services;

(i). INSTANT MESSAGING. Websites that allow users to communicate in "real time" over the Internet;

(j). MALWARE. sites that are infected with destructive or malicious software, specifically designed to damage, disrupt, attack or manipulate computer systems without the user's consent, such as as virus or trojan horse; and

(k). SPYWARE. Sites that host software that is covertly downloaded to a user's machine, to collect information and monitor user activities, including spyware, adware etc.

///

Statement of Material Facts

Page 8 of 22

45. NCRL also blocks the images search, video search, and spam URL classifications of Websites, as well as certain specific sites and pages within those sites.

1. Accessibility Of Blocked Internet Sites.

46. If an NCRL patron wishes to access a Website or page that is blocked by FortiGuard, the patron may ask NCRL to manually override the filter by sending an e-mail to NCRL administrators.

47. When a request is submitted, the Website or page at issue is reviewed to determine whether allowing access would be consistent with NCRL's mission, it's policies, and Childrens Internet Protection Act (CIPA) requirements.

48. If the request is approved, access is allowed on all public computers in all NCRL branches.

49. If, on the other hand, NCRL deems the request to be inconsistent with it's mission, it's policies, or CIPA, the request is denied.

50. NCRL received 92 requests to unblock access to Websites (including 90 automated requests) between October 1, 2007, and February 20, 2008.

51. Of these 90 automated requests, NCRL responded as follows:

(a). within less than an hour to eight (8) of the requests; (b) within the same day to ninteen (19) of the requests; (c) the day after twenty-nine (29) of the requests; (d) more than twenty-four (24) hours, but less than three days, after twenty (20) of the requests; (e) more than three (3) days after five (5) of the requests; and (f) there is no evidence in the record if NCRL

Statement of Material Facts
Page 9 of 22

responded to the remaining eleven (11) requests.

52. since October 1, 2007, NCRL unblocked sites upon request on twelve (12) occasions.

53. Examples of sites unblocked at a patron's request include: artbyjohndan.com (describe by the requestor as "non-offensive, mostly abstract art"), (erroneously blocked as pornography), (described by the requestor as a nonprofit ministry but erroneously blocked as gambling), and (erroneously blocked as malware).

54. FortiGuard also blocked access to the Kalispel tribes Website under the "gambling" category, even though the site did not itself allow any online gambling; upon a patron's request, NCRL unblocked access to the tribe's Website while the patron was in the library researching employment opportunities.

2. The FortiGurad Error Rate.

55. Like all Internate filters, the FortiGuard filter makes mistakes.

56. In some instances, NCRL patrons were able to obtain pornographic, sexually explicit, child pornography, or obscene materials online at NCRL branch libraries.

57. In other instances, NCRL patrons were unable to access sites that should not have been blocked.

58. Expert Bennett Haselton tested the FortiGuard filters accuracy, describing his methodology and results in an expert report.

///

Statement of Material Facts
Page 10   of   22

59. Mr.Haselton determining of 100,000 randomly-selected .com domains, FortiGuard blocked 536 "real" Webpages as pornography or adult materials, and that of those blocked sites 64 were blocked in error, for an error rate of 11.9%.

60. Mr.Haselton determined that of 100,000 randomly-selected .org domains, FortiGuard blocked 207 "real" Webpages as pornography or adult materials, and that of those blocked sites 49 were blocked in error, for an error rate of 23%.

61. NCRLs expert, Dr. Paul Resnick, conducted his own study based on the URLs that were actually visited or requested at NCRL branch libraries during the week of August 23-29, 2007.

62. Dr.Resnick found that, of 60,000 URLs that were visited or requested during the week of August 23-29, 2007, 2,180 URLs were blocked by FortiGuard filter under NCRLs filtering policy, and that of those 2,180 URLs:

> (a) 289 complete Webpages were blocked, with 20 of those blocked in error; (b) 1,406 "helper images" (that is, little images that are parts of the Webpages") were blocked, with 744 of those blocked in error; (c) 194 "other images" were blocked, with 24 of those blocked in error; (d) 110 URLs were not "ratable" – meaning that Dr.Resnick could not determine whether they had been correctly blocked.

63. NCRL expects branch libraries to monitor and respond to complaints of inappropriate public computer use.

3. Constitutionality of Using FortiGuard.

64. According to both it's "Internet Public Use Policy" and "Collection Development Policy" (collectively, "Policy"), NCRL sets

FortiGuard's filtering parameters to filter Webpages and sites that depict hancking, phishing, proxy avoidance, malware, and spyware, display nudity, promote sexuality, or allow gambling.

65. Not all of the blocked Webpages and sites contain constitutionally unprotected speech. Therefore, as a result of the FortiGurad filter, constitutionally-protected speech is blocked and patrons, even adult patrons, are unable to view the material.

66. As a public library, NCRL pursues the "worthy mission" of facilitating learning, research, and recreational pursuits.

67. It is undisputed that to fulfill these missions, NCRL is not required to provide "universal coverage" and enjoys "broad discretion to decide what materials to provide to it's patrons.

68. It is reasonable for NCRL to develop an Internet Policy that can be implemented consistently throughout it's twenty-eight (28) libraries, and it did so by implementing the policy.

69. Blocking Internet sites and pages that contain constitutionally-protected materials deeded suitable only for adults helps ensure that the environment at NCRL libraries is consistent with it's mission of providing learning and research opportunities for individuals of all ages. This is a legitimate governmental interest.

70. And NCRLs practice of requiring a patron to request that a particular Website of page be unblocked is an efficient and rational way for NCRL to determine whether that Website of page is consistent with it's policies and mission, especially in light of the Internet's continuous change.

///

7

Statement Of Material Facts

Page 12 of 22

71. NCRL simply does not have the resources to have it's staff review the vast and limitless amount of sites and pages on the Internet to determine whether they are consistent with it's policies and missions. NCRLs unblocking-request process reasonably accomplishes it's policies and missions, while at the same time complying with CIPA.

72. The Courts acknowledge that this process may frustrate some adult patrons. However, without the funding provided by CIPA, NCRL likely could not provide any Internet access to it's patrons.

73. Mr.Entler respectfully requests that this Court take "Judicial Notice" of the decision and facts in Bradburn v. N. Cent. Reg'l Library Dist., No. CV-06-0327-EFS, 2012 U.S. Dist. Lexis 50360(E.D. Wash. April 30, 2012); Bradburn v. N. Cent. Reg'l Library Dist., No. CV-06-0327-EFS, 2008 U.S. Dist. Lexis 97134(E.D. Wash. Sept. 30, 2008); Badburn v. N. Cent. Reg'l Library Dist.,168 Wash.2d 789,231 P.3d 166(Wash. S.ct. 2009), pursuant to Rosales-Martinez v. Palmer, 753 F.3d at 894; Outdoor Media Grp. Inc. v. City of Beaumont, 506 F.3d at 899.

D. Jpay JP5 Tablet.

74. The Washington State Department of Corrections (WDOC) provides inmates access to a JP5 Tablet that has a 32G memory. However, inmates must pay money to use the Jpay kiosk system provided by Jpay.com and WDOC receives "kick-backs" (funds) from inmates use of the Jpay Kiosk system.

75. Jpay sells a JP5 Tablet which has been approved for inmate possession by WDOC, which is a electronic device that works with a Jpay Kiosk.

76. The JP5 tablet connects to the kiosk to provide the latest updates to the content on the JP5 player and the devices software.

Statement of Material Facts
Page 13 of 22

77. POWER: The JP5 tablet is connected to a power outlet, and provides a display that will indicate when it is fully charged.

1. How The JP5 Tablet Operations.

78. All of the buttons and ports on the JP5 tablet are on the right side of the device.

a. External Buttons & Ports.

79. The top most button is the power button that is pressed and hold to activate the JP5 tablet.

80. The two other buttons below are volume buttons, the middle-button raises the volume, and the bottom button lowers it.

81. The middle-port, is the charging port. This round port corresponds to the round plug on the charger.

82. The round outlet with a silver ring accepts the plug at the end of headphones or earbuds.

83. The JP5 tablet has a mini-UBS port that is connected to the Jpay kiosk to sycn the JP5 tablet.

b. Touch & Type Tablet.

84. The JP5 tablet is a touch and type tablet. To select or activate something on the JP5 tablet, you touch the screen.

85. To type something, such as a name, password, or search terms, just touch where you want to type. A keyboard pops up that lets you

Statement of Material Facts
Page 14 of 22

type into the field.

86. TOUCH: The JP5 tablet is a touch screen device you can select items by touching a finger to the available options.

87. TOUCH & HOLD: The JP5 tablet touch and hold feature is available on some applications. Touching the screen and holding a finger on the location will reveal additional menu options.

88. DRAGING: The JP5 tablet features a touch and hold item for movement and without lifting your finger, move your finger on the screen until you reach the target position. For example, you can move Apps around on the home screen.

89. SWIPE OR SLIDE: By quickly moving your finger across the surface of the screen, without pausing when you first touch (so you do not drag something instead).

90. DOUBLE TAP: Tapping quickly twice on a webpage, map, or toher screen to zoom. For example, double tap a picture to zoom in, and double tap again to zoom out.

91. PINCH: On the JP5 tablet, in some apps, you can zoom in and out by placing two fingers on the screen at once and pinching them together (to zoom out) or spread them apart (to zoom in).

92. ROTATE THE SCREEN: The JP5 tablet has a screen rotation feature, to rotate the image on the screen.

93. HOME SCREEN: The JP5 tablet has a home screen that displays all the apps that are currently on the JP5 tablet, It also features several Icons that will always appear no matter what the JP5 tablet is doing.

94. NAVIGATION: At the bottom of the screen on the JP5 tablet, no matter what your doing, are always showing three navigation buttons, "Back," "Home," and "Recent Apps" navigation.

95. TOP TOOLBAR: The JP5 tablet at the very top of the screen displays some key information, including name, date, time, and four important Icons "brightness," "Volume," Battery Life," and "system minu."

96. SYSTEM MINU: Located in the upper right hand corner of the screen on the JP5 tablet is the minu button, This is always displayed, no matter what you are doing on the JP5 tablet. The minu has three section, "Help," "settings," and "sleep."

c. Typing, Editing Text.

97. The JP5 tablet can be used to enter text using the onscreen keybaord. Some of the Apps open it authomatically. In others you open it. To make the keyboard go away, touch the modified arrow below the space bar.

98. EDITING: The JP5 tablet has basic editing features, such as "move the incertion point," "select text," "delete text," Type capital letters," "turn caps lock on,"and "cut, copy, past" features.

99. SETTINGS: The JP5 tablet has settings, they are "personal language & imput," "keyboard & imput methods," and "android keyboard."

d. JP5 Apps.

100. The JP5 tablet features Apps. The apps include: "standard radio," "my music," "clock," "calculator," "help," "video games,"

"shopping cart," "app manager," "game store," "e-mail," "e-cards," "video grams," and "photo album."

101. The JP5 tablet also provides free games, they are "Tilt-maze," "memory," and "XOXOXO," and these have apps.

102. The JP5 tablet also has "wall paper" features, and provides selections to choose from.

e. Jpay's Limitations.

103. A prisoner cannot use the Jpay system for any purpose without having to pay to use it's functions.

104. The Jpay system does not provide a Web-page where prisoner's can post a picture of themselves to share with religious entities in the general public.

105. The Jpay system does not provide a Web-page where prisoners can post religious ideas to share with religious entities in the general public.

f. Jpay Error Rate.

106. Like all Internet filters, Jpay's filtering system makes mistakes.

107. In some instances, prisoners were able to obtain pornographic, sexually explicit, obscene materials, material that involves gang activity, or other materials that involve sexually suggestive content that depict adults or what appears to be children, on the current Jpay system.

Statement of Material Facts
Page 17 of

108. The Jpay filtering system has blocked photographs that should not have been blocked.

109. WDOC has an appeal process where prisoner's can request review by WDOC officials of materials that should not have been blocked.

110. WDOC has granted access to material's that should not have been blocked when prisoners appeal their rejection notices.

111. WDOC has denied appeals by prisoners to unblock access to material that have been blocked, that WDOC has deemed violated legitimate penological interests, goals, or policies, that have been blocked through their Jpay filtering system.

E. The Essene Religion Beliefs & Practices.

112. Mr.Entler has filed for his Master Business License with the State of Washington "Business Licensing Service," and has filed his "Articles of Incorporation" (Non-profit), with the State of Washington "Secretary of State," to obtain his Master Business License for his Incorporated Non-Profit Church.

113. Mr.Entler has established his "Constitution and By-Laws" for his non-profit Church. See Attachment 3.

114. Mr.Entler's Constitution and By-Laws contain and outline at page 9, his Religious Holy Days and Religious Events, which contain his sincerely-held religious beliefs and practices.

115. Mr.Entler has established his Chruch's "Pneumatology," "Yashueology" (Christology), "Soteriology," "Theology," "Hamartialogy," "Eschatology," "Bibliology," "Angelology," "Anthropology," and

Statement of Material Facts
Page 18 of

"Ecclesiology" which contain and outline his sincerely held religious beliefs and practices. See Attachment 4.

116. Mr.Entler has obtained a legal name change, which Yahvah (God) told him to change his name, to "Galhen Melchizedek," in the Walla Walla County District Court. See Attachment 5.

117. Mr.Entler's instructions from Yahvah (God) to start a church and to teach the Gospel of Melchizedek is contained in the introduction to "The Gospel of Melchizedek." See Attachment 6.

118. Mr.Entler's "Ordination" by Yahshua (Jesus) in Heaven is contained and outlined in "The Gospel of Melchizedek." See Attachment 6, at pp. 3-4

119. Mr.Entler has written a 32 page book called "The Book of Galhen Presents, The Dead Sea Scrolls In The New Testament," that outlines the Essene's pre-christian existence and how their belief contributed to the New Testament. This Book contains and outlines who the Essene's are and where the Essene's are in the Bible. See Attachment 7.

120. Mr.Entler's sincerely held religious beliefs and practices of his Essene Religion requires him to "proselytize" and preach the Gospel of Melchizedek to the whole world, as an Apostle of Yahshua (Jesus).

121. If Mr.Entler does not follow his instructions from Yahvah he will loose his names place from the Book of Life.

F. MR Mr.Entler's Google G-Mail.

122. Mr.Entler has a Google G-mail Account (GGA).

///

Statement of Material Facts
Page 19 of 22

123. Mr.Entler's GGA provides a free Web-page where he can post pictures of himself to share with religious entities in the general public.

124. Mr.Entler's GGA provides him the opportunities to share his religious ideas with religious entities in the general public, such as talks, chats, sharing, scheduling, storing information/documents, organize, collaborate, and create with religious entities in the general public.

125. Mr.Entler's GGA lets him access his Gmail, photos, to takes pictures, free up-loading pictures automatically, share with religious entities selectively, start a video hangout with religious entities, text a group of religious entities all at once with religious entities in the general public.

G. Least Restrictive Means.

126. WDOC can contract with a Cable Internet Service Provider (C-ISP) to provide Internet Access to Mr.Entler, for religious purposes, through it's existing TV cable system, using filters like "FortiGurad" and their "Jpay Filtering."

127. WDOC can contract with the Jpay company to be a Internet Service Provider (ISP), providing Internet access to Mr.Entler, for religious purposes, through it's existing Jpay system.

128. WDOC can adopt policies like the NCRL to provide Internet access to Mr.Entler for religious purposes, through it's existing Jpay system.

129. WDOC can use filtering systems such as "FortiGuard" and their

Statement of Material Facts
Page 20 of 22

"Jpay filtering System" to limit what Mr.Entler has access to on his
GGA, See ¶¶ 35-45, as used by him for religious purposes.

130. WDOC already has a appeal process where prisoners can request
access to material that has been blocked or erroneously blocked like
the NCRL filtering system.

131. Because WDOC can enforce it's legitimate penological interests,
goals, and policies by using either a C-ISP or Jpay company it already
is under contract with, by using filtering systems, WDOC's "no personal
computer" "no internet access" policy is not the lest restrictive means
of enforcing or achieving it's legitimate penological interests, goals,
or policies.

132. WDOC will punish Mr.Entler for attempting to receive or from
having a personal computer or like device that is not authorized. See
Sutton v. Pacholke, 2013 U.S. Dist. LEXIS 80485 (W.D. Wash. May 9,
2013) (prisoner infracted for possession and unauthorized use of cell
phone); In Re Personal Restraint of Norman, 2013 Wash. App. LEXIS 2563
(Div. 1, Oct. 28, 2013) (Infraction for unauthorized use of computer).

133. Because WDOC will punish Mr.Entler for attempting to possess or
for possessing an unauthroized personal computer or a like device that
has Internet [illegible] Mr.Entler is left to choose between breaking
prison dis[illegible] and being punished, or having no means to
exercise [illegible] sincerely held religious beliefs and requirments to
"proselytize" his Essene Religious Beliefs and Practices to teach the
"Gospel [illegible] Melchizedek [illegible] both the general public as well as the
religious [illegible] WDOC's no personal computer and no Internet
access poli[illegible] substantially burden's Mr.Entler's sincerely held
religious beliefs and practices.

///

Statement of Material Facts
Page  21  of  22

I declare under the penalty of perjury under the laws of the United States that the above is true and correct to the best of my personal knowledge, beliefs, and experiences.

Signed this 23rd day of _____ May _____, 2017

Signed: _____
        JOHN THOMAS ENTLER, #964471
        WASHINGTON STATE PENITENTIARY
        1313 N. 13TH AVE.
        WALLA WALLA, WA. 99362

Subscribe to and sworn to before me this 23rd day of May _____, 2017, by John Thomas Entler.

_____
NOTARY PUBLIC IN AND FOR THE
STATE OF WASHINGTON, RESIDING
AT WALLA WALLA, WASHINGTON
MY COMMISSION EXPIRES:
April 1, 2021 .

///
///
///
///
///
///
///
///

Statement of Material Facts
Page 22 of 22

# ATTACHMENT-2

ATTACHMENT-2

40



STATE OF WASHINGTON
**DEPARTMENT OF CORRECTIONS**
P.O. Box 41100 • Olympia, Washington 98504-1100

February 16, 2017

Mr. John Entler, DOC 964471
Washington State Penitentiary, Rainier Unit
1313 North 13th Avenue
Walla Walla, Washington 99362

Dear Mr. Entler:

Your letter regarding a request for a laptop and internet access has been received.  I have
reviewed the information you provided and the denial is upheld.

Inmates incarcerated in Washington State prisons are not authorized to have computers nor
internet access for any purpose.  Your concerns have been addressed by your facility chaplain
and now Headquarters.  Any further correspondence on this matter, submitted by you or
someone on your behalf, will not receive a response.

Sincerely,

Belinda D. Stewart, Corrections Program Administrator
Prisons Division

BDS:lf:DEP32518

cc:    Rob Herzog, Deputy Director
       Donald Holbrook, Superintendent
       Carla Schettler, Associate Superintendent
       Gil Alden, Chaplain
       Joann McCoy, Classification Counselor
       Inmate File

*" Working Together for SAFE Communities"*

recycled paper



**Department of Corrections**
WASHINGTON STATE

LOG I.D. NUMBER

17628112

**OFFENDER COMPLAINT**

CHECK ONE: ☒ Initial  ☐ Emergency  ☐ Appeal  ☐ Rewrite

**RESIDENTIAL FACILITIES:** Send completed form to the Grievance Coordinator. Explain <u>what happened</u>, <u>when</u>, <u>where</u>, and <u>who</u> was involved or which policy/procedure is being grieved. Be as brief as possible, but include the necessary facts. Use only one complaint form. A formal grievance begins on the date the typed grievance forms are signed by the Coordinator. Contact a Department employee to report an emergency situation or to initiate an emergency complaint. Please attempt to resolve all complaints through the appropriate Department employee(s) before pursuing a grievance.

**NOTE:**   <u>Complaints must be filed within 20 working days of the incident.  Appeals must be filed within 5 working days of receiving the response.  Include log ID # on rewrite or response being appealed.</u>

| Last Name Entler | First John | Middle T. | DOC Number 964471 | Facility/Office WSP | Unit/Cell Rainier B-307 |
|---|---|---|---|---|---|

**COMMUNITY SUPERVISION:** Send completed copies of this form directly to: Grievance Program Manager, Offender Grievance Program, Department of Corrections, P.O. Box 41129, Olympia WA 98504-1129.

| MAILING ADDRESS:  STREET OR P.O. BOX | CITY, STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|

**COMPLAINT:** I want to grieve Doc's "no personal computer", "No internet access" restrictions on my Religious exercise. I applied to Doc Headquarters to be able to have a personal computer and access to the internet to proselytize my Essene Religion and the Gospel of melchizedek to people in the world. See Attached Letter (Please Return letter to me), Headquarters denied my request without explaining why. Doc is substantially burdening my religious rights under RLUIPA. Doc is not using the least restrictive means of burdening my religious exercise. I should be allowed access to computer, and access to internet under supervision of the Chaplain.

**SUGGESTED REMEDY:** I request that I be given access to the internet and to have a personal computer to exercise my religious beliefs.

Mandatory  _John T. Entler_ (Signature)   2/26/17 (Date)

| GRIEVANCE COORDINATOR'S RESPONSE | Facility/Office WSP | Date Received 2-27-17 |
|---|---|---|

Your complaint is being returned because:
☒ It is not a grievable issue.
☐ You requested to withdraw the complaint.
☐ You failed to respond to callout (sheet) on _____.
☐ Administratively Withdrawn
☐ The formal grievance/appeal paperwork is being prepared.

☐ The complaint was resolved informally.
☐ Additional information and/or rewriting needed. (See below.)
   Return within 5 working days or by: _____.
☐ No rewrite received
☐ Sent to _____ (facility) on _____ (date).

**EXPLANATION:** DOC POLICY 280.925 IS CLEAR OUTLINING OFFENDER ACCESS TO ELECTRONIC DATA. ISSUES WITH AN ESTABLISHED APPEAL PROCESS MAY NOT BE GRIEVED. YOU MAY APPEAL AS YOU DEMONSTRATE THAT YOU HAVE.

| Coordinator's Name (print) K. Walker | Coordinator's Signature K Wl | Date 03/02/17 |
|---|---|---|

DOC 05-165 Front (Rev. 02/14/13)                DOC 310.100, DOC 550.100





Department of
**Corrections**
WASHINGTON STATE

LOG I.D. NUMBER
16602120

**OFFENDER COMPLAINT**

**CHECK ONE:**  ☒ Initial    ☐ Emergency    ☐ Appeal    ☐ Rewrite

**RESIDENTIAL FACILITIES:** Send completed form to the Grievance Coordinator. Explain <u>what happened</u>, <u>when</u>, <u>where</u>, and <u>who</u> was involved or which policy/procedure is being grieved. Be as brief as possible, but include the necessary facts. Use only one complaint form. A formal grievance begins on the date the typed grievance forms are signed by the Coordinator. Contact a Department employee to report an emergency situation or to initiate an emergency complaint. Please attempt to resolve all complaints through the appropriate Department employee(s) before pursuing a grievance.

**NOTE:**  <u>Complaints</u> must be filed within <u>20 working days</u> of the incident. <u>Appeals</u> must be filed within <u>5 working days</u> of receiving the response. Include log ID # on rewrite or response being appealed.

| Last Name | First | Middle | DOC Number | Facility/Office | Unit/Cell |
|---|---|---|---|---|---|
| Entler | John | T. | 964471 | WSP/Baker | Baker B-110 |

**COMMUNITY SUPERVISION:** Send completed copies of this form directly to: Grievance Program Manager, Offender Grievance Program, Department of Corrections, P.O. Box 41129, Olympia WA 98504-1129.

| MAILING ADDRESS:  STREET OR P.O. BOX | CITY, STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|
| | | | |

**COMPLAINT:** I want to grieve Mr. Holbrook, Sheri Hall, and Lisa Morrow for introducing contraband into a correctional facility. On December 17, 2015, a Lexis Nexis computer program was put into the South Complex law Library. That computer program provides prisoners with information about my criminal conviction which other prisoners can use to assault or extort me. It is a class C Felony to provide inmates information they can use to comitt crimes. The West Law Computer system that was in the law Library did not provide inmates access to "unpublished" state court cases. The new Lexis Nexis provides inmates will "ALL" unpublished state court cases, when in fact you cannot even cite unpublished state court cases in legal pleadings, and are not necessary for prisoners to have to prepare there cases to the courts. All my cases regarding my criminal convictions are "unpublished" and inmates should not have access to them.

**SUGGESTED REMEDY:** That the West Law Computer system be put back in the law Library, or that my unpublished cases be removed from the Lexis Nexis computer system, and that the individuals grieved be reported to law inforcement.

Mandatory ___Geo. J. Gter___    ___1/5/16___
                Signature                          Date

---

**GRIEVANCE COORDINATOR'S RESPONSE**
Your complaint is being returned because:

| | Facility/Office  WSP | Date Received  1-11-16 |
|---|---|---|

☐ It is not a grievable issue.
☐ You requested to withdraw the complaint.
☐ You failed to respond to callout (sheet) on _____.
☐ Administratively Withdrawn
☒ The formal grievance/appeal paperwork is being prepared.

☐ The complaint was resolved informally.
☐ Additional information and/or rewriting needed. (See below.)
   Return within 5 working days or by: _____.
☐ No rewrite received _____.
☐ Sent to _____ (facility) on _____ (date).

**EXPLANATION:**  _Level 1_

| Coordinator's Name (print)  K. Walker | Coordinator's Signature  K Wel | Date  01/12/16 |
|---|---|---|

DOC 05-165 Front (Rev. 04/01/14)                                      DOC 310.100, DOC 550.f100

43

NUMERO DE REGISTRO
16602120



Department of
**Corrections**
WASHINGTON STATE

**LEVEL I - INITIAL GRIEVANCE**
*NIVEL 1 - QUEJA INICIAL*

| Name: NOMBRE: | Last APELLIDO | First PRIMERO NOMBRE | Middle 2DO NOMBRE | DOC Number NUMERO DOC | Facility/Office FACILIDAD | Unit/Cell UNIDAD/CELDA |
|---|---|---|---|---|---|---|
| | Entler | John | T. | 964471 | WSP | BB110 |

| PART A - INITIAL GRIEVANCE/*PARTE A - QUEJA INICIAL* | Date Typed 1/12/16. | Date Due 1/28/16 |
|---|---|---|

**I WANT TO GRIEVE / *QUIERO QUEJARME DE*:** Mr. Holbrook, Sheri Hall, and Lisa Morrow for introducing contraband into a correctional facility. On December 17, 2015, a Lexis Nexi's computer program was put into the South Complex Law Library. That computer program provides prisoners with information about my criminal conviction which other prisoners can use to assault or extort me. It is a class C felony to provide inmates information they can use to commit crimes. The West law computer system that was in the law library did not provide inmates access to "unpublished" state court cases. The new Lexis Nexis provides inmates with "all" unpublished state court cases, when in fact you cannot even cite unpublished state court cases in legal pleadings, and are not necessary for prisoners to have to prepare their cases to the courts. All my cases regarding my criminal convictions are "unpublished" and inmates should not have access to them.

**SUGGESTED REMEDY / *REMEDIO SUGERIDO*:** That the West Law Library computer system be put back in the law library, or that my unpublished cases be removed from the Lexis Nexis computer system, and that the individuals grieved be reported to law enforcement.  [1/5/16]

| K. Walker | 1/13/16 | John Entler | 1/13/16 |
|---|---|---|---|
| Grievance Coordinator Signature *FIRMA DE COORDINADOR DE QUEJAS* | Date *FECHA* | Grievant Signature *FIRMA DE QUEJANTE* | Date *FECHA* |

| PART B - LEVEL I RESPONSE / *PARTE B RESPUESTA PRIMER NIVEL* |
|---|

AA4 S. Hall reports: There is no difference between unpublished and published case law in our libraries.  Both can and do contain incarcerated offender information about their convictions.  Unpublished case law is allowed in the 9th circuit court of appeals.

| K. Walker  _K Wu_ | 01/28/16 |
|---|---|
| Grievance Coordinator Signature *COORDINADOR DE QUEJAS* | Date *FECHA* |

You may appeal this response by submitting a written appeal to the Coordinator within five (5) working days from date this response was received.
*Ud. puede apelar esta respuesta al someter una apelación por escrito al coordinador dentro de cinco (5) días de trabajo de la fecha en que esta respuesta fue recibida.*





Department of
**Corrections**

| LOG I.D. NUMBER |
|---|
| 16602120 |

## OFFENDER COMPLAINT

CHECK ONE: ☐ Initial ☐ Emergency ☑ Appeal ☐ Rewrite

**RESIDENTIAL FACILITIES:** Send completed form to the Grievance Coordinator. Explain <u>what happened</u>, <u>when</u>, <u>where</u>, and <u>who</u> was involved or which policy/procedure is being grieved. Be as brief as possible, but include the necessary facts. Use only one complaint form. A formal grievance begins on the date the typed grievance forms are signed by the Coordinator. Contact a Department employee to report an emergency situation or to initiate an emergency complaint. Please attempt to resolve all complaints through the appropriate Department employee(s) before pursuing a grievance.

**NOTE:** Complaints must be filed within <u>20 working days</u> of the incident. Appeals must be filed within <u>5 working days</u> of receiving the response. Include log ID # on rewrite or response being appealed.

| Last Name | First | Middle | DOC Number | Facility/Office | Unit/Cell |
|---|---|---|---|---|---|
| Entler | John | T. | 964471 | WSP | Rainier B-307 |

**COMMUNITY SUPERVISION:** Send completed copies of this form directly to: Grievance Program Manager, Offender Grievance Program, Department of Corrections, P.O. Box 41129, Olympia WA 98504-1129.

| MAILING ADDRESS: STREET OR P.O. BOX | CITY, STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|
| | | | |

**COMPLAINT:** I want to appeal to the next level. In the history of WSP up to the time the computer's were put in and the Lexis Nexus put in, prisoners never had access to "unpublished state court cases". If WSP can reject public disclosure request sent by Headquarters, because they pose a threat to inmates, why cant WSP reject the Lexis Nexus sent by Headquarters because it poses a threat to the safety of inmates. This is the hypocritical position of mrs. Hall and cpm Barker, when they say they dont have the authority to remove the Lexis Nexus system from WSP. under their hypocritical position, if Headquarters said to give every inmate a gun, they would do it because they have no authority to remove guns from WSP. This Lexis Nexus system should have never been allowed at WSP and mrs. Hall and cpm Barker should have rejected it, because they have a right to refuse unlawful orders by Headquarters, but are instead being deliberate indifferent to prisoners safety.

**SUGGESTED REMEDY:** Same as initial suggested remedy.

Mandatory ___[signature]___   3/4/16
Signature   Date

| GRIEVANCE COORDINATOR'S RESPONSE | Facility/Office | Date Received |
|---|---|---|
| Your complaint is being returned because: | WSP | 3-7-16 |

Your complaint is being returned because:
- ☐ It is not a grievable issue.
- ☐ You requested to withdraw the complaint.
- ☐ You failed to respond to callout (sheet) on _____
- ☐ Administratively Withdrawn _____
- ☐ The formal grievance/appeal paperwork is being prepared.

- ☐ The complaint was resolved informally.
- ☑ Additional information and/or rewriting needed. (See below.)
  Return within 5 working days or by: 3/14
- ☐ No rewrite received _____
- ☐ Sent to _____ (facility) on _____ (date).

**EXPLANATION:** REWRITE AND OMIT ALL INFORMATION IN REGARDS TO REFLECTING PUBLIC DISCLOSURE AND GIVING INMATES GUNS. YOUR CRITICAL ISSUE IS IN REGARDS TO UNPUBLISHED COURT CASES, STICK WITH THAT SUBJECT.

| Coordinator's Name (print) | Coordinator's Signature | Date |
|---|---|---|
| K. Walker | K.W. | 03/09/11 |



Department of
**Corrections**
WASHINGTON STATE

| | LOG I.D. NUMBER |
|---|---|
| | **16602120** |

**APPEAL TO LEVEL II**
**APELACIÓN AL 2DO NIVEL**

| Name: NOMBRE: | Last APELLIDO | First PRIMERO NOMBRE | Middle 2DO NOMBRE | DOC Number NUMERO DOC | Facility/FACILIDAD Office | Unit/Cell UNIDAD/CELDA |
|---|---|---|---|---|---|---|
| | Entler | John | T. | 964471 | WSP | RB307 |

| PART A – INITIAL GRIEVANCE/PARTE A - QUEJA INICIAL | Date Typed 2/2/16. | Date Due 3/3/16 |
|---|---|---|

**I WANT TO APPEAL:** to the next level. Mrs. Hall does not address the "unpublished state court cases" that I raised in my grievance. She talks about "unpublished case law in the Ninth Circuit" which is allowed to be used, and I am not talking about that. This grievance response represents Mrs. Hall's "sham" investigation as normal addressing an issue not brought up in my grievance so she does not have to grant me any relief in the grievance process. It is also Mrs. Hall's way of continuing to ignore prisoner safety and prison safety and security.

**SUGGESTED REMEDY:** Same as initial suggested remedy. [1/29/16]

| K. Walker | 2/3/16 | John Entler | 2/3/16 |
|---|---|---|---|
| Grievance Coordinator Signature FIRMA DE COORDINADOR DE QUEJAS | Date FECHA | Grievant Signature FIRMA DE QUEJANTE | Date FECHA |

| PART B –LEVEL II RESPONSE/PARTE B RESPUESTA 2DO NIVEL |
|---|

CPM S. Barker has investigated your grievance and this is a summary of the investigation / response: I have reviewed your Level 1 grievance and response, as well as your Level 2 appeal. You were interviewed at Level 2.

You reiterated your position that you thought that it was putting offenders at risk to have unpublished case law on the law library system. I explained to you that WSP does not have the access or authority to alter the electronic database and so there is no local control over the system. You were surprised at that. I informed you that the Electronic Law Library was through a statewide contract with Lexis Nexus [sp] and that your only resource was to address the issue with the HQ Administrator over the contract. WSP staff do not have the access or authority to remove case law from the electronic law library database. The database is administered through a statewide contract and would have to be addressed at the HQ level. You agreed.

I concur with this response.

Don Holbrook        3-1-16
Superintendent, Work Release Supervisor, Field Administration Signature        Date
SUPERINTENDENTE        FECHA

You may appeal this response by submitting a written appeal to the coordinator within cinco (5) working days from date this response was received.
Ud. puede apelar esta respuesta al someter una apelación por escrito al coordinador dentro de cinco (5) días de trabajo de la fecha en que esta respuesta fue recibida.



LOG I.D. NUMBER/*NUM. DE REGISTRO*
16602120

**APPEAL TO LEVEL III**
*APELACIÓN AL 3ER NIVEL*

| Name:<br>*Nombre:* | Last<br>*Apellido*<br>Entler | First<br>*Nombre*<br>John | Middle<br>*2do Nombre*<br>T. | DOC Number<br>*Número DOC*<br>964471 | Facility/Office<br>*Institución/Oficina*<br>WSP | Unit/Cell<br>*Unidad/Celda*<br>RB307 |
|---|---|---|---|---|---|---|

| PART A - APPEAL TO LEVEL III<br>*PARTE A - APELACIÓN 3ER NIVEL* | Date Typed / *Fecha escrita a mano*<br>3/17/16. | Due Date / *Fecha de vencimiento*<br>04/14/16 |
|---|---|---|

**I WANT TO GRIEVE /** *QUIERO QUEJARME DE*: In the history of WSP, up to the time the computers with the software from Lexi's Nexis, prisoner had not had access to unpublished cases in state court. Lexis Nexis is a threat to prison safety and security and should be removed from WSP, and Mrs. Hall and CPM Barker, and Mr. Holbrook should not have allowed inmates access to it.

**SUGGESTED REMEDY /** *REMEDIO SUGERIDO*:  Same as initial suggested remedy.

| /s/ K. Walker | 3/18/16 | /s/ John Entler | 3/18/16 |
|---|---|---|---|
| Grievance Coordinator Signature<br>*Firma del Coordinador de quejas* | Date<br>*Fecha* | Grievant Signature<br>*Firma del agraviado* | Date<br>*Fecha* |

| PART B - LEVEL III RESPONSE/*PARTE B - RESPUESTA 3ER NIVEL* |
|---|

I reviewed your initial grievance as well as all appeals and responses.

DOC Manager Roy Gonzalez also reviewed this grievance and provided this response:

I reviewed your Level I and II grievance, the investigation, and the responses. I have read your Level III appeal.

The Level I and II responses appropriately addressed your issue. I concur with the previous responses.

| Assistant Secretary/Deputy Director/designee<br>*Subsecretario/designado*                    Robert Herzog | Date<br>*Fecha* |
|---|---|

# ATTACHMENT

# 3

ATTACHMENT - 3

No.  00000001


# E S S E N E   A S S E M B L Y


# O F   Y A H V A H


A Non-Profit Church


# C O N S T I T U T I O N


# A N D


# B Y  -  L A W S


Prison Ministries


By: Galhen Melchizedek, Director &
    A Teacher Of Righteousness
    Essene Assembly of Yahvah
    ® 2017

# I. TABLE OF CONTENTS.

```
  I. Table of Contents..............2
 II. Introduction...................2
III. Preamble......................3
 IV. Constitution...................3-10

     Article -  1...................3
     Article -  2...................3
     Article -  3...................4
     Article -  4...................4
     Article -  5...................4
     Article -  6...................4-5
     Article -  7...................5-6
     Article -  8...................6
     Article -  9...................6
     Article - 10...................7
     Article - 11...................7
     Article - 12...................7-8
     Article - 13...................8-9
     Article - 14...................9-10
     Article - 15...................10
```

## II. INTRODUCTION.

2.1 This CONSTITUTION is ORDAINED and ENACTED under the AUTHORITY of GALHEN MELCHIZEDEK, who was ORDAINED "A TEACHER OR RIGHTEOUSNESS" and given the AUTHORITY to do so by YAHSHUA (Jesus) HIMSELF in the TEMPLE of YAHVAH.

2.2 The Essene Assembly of Yahvah (EAY) is a "Non-profit Church," established for the purpose and objectives of preserving Yahvah's true Gospel, to provide prisoner's a way to reach out to religious and non-religious entities who share the same religious beliefs, to allow religious and non-religious entities to reach out to prisoners and have a positive effect on their lives, to off-set the cost of government expense for providing prisoners with religious services, and to defend it's members and their rights to associate together for the common good.

2.3 Donations to the EAY are used to  operate the EAY, to provide religious services to prisoners, and defend its's member(s) under the "Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §2000cc-1-5." The EAY adopts RLUIPA and the United States Supreme Courts's decision in Holt v. Hobbs,135 S.ct 853(2015), into this Constitution and are fully reinstated herein for all intents, purposes, and objectives of the EAY.

/// 
///



## III. PREAMABLE.

BY REASON OF AUTHOITY IN THE ESSENE ASSEMBLY OF YAHVAH (God), BY GALHEN MELCHIZEDEK, A TEACHER OF RIGHTEOUSNESS, issued on this first day of the month of BETHULAH in the year of our LORD 7517, the Essene Assembly of Yahvah opened in ample form by Galhen Melchizedek, as a sovereign "Non-profit Church," and assembled this day to organize one religious body in Yahshua (Jesus Christ), and to form a Constitution and By-Laws by this authority assembled, is hereby ordained and is written. It's sovereign jurisdiction embracing THE ENTIRE UNIVERSE OF GOD:

"that no law, constitution, edict or by-law, having such reduction or addition in view(s) shall ever be made, passed, or enacted in this sovereign jurisdiction without the consent of the Teacher of Righteousness (TR) GALHEN MELCHIZEDEK. And the office of the Teacher or Righteousness (TR) shall declare any and all such enactments, resolution(s) tending to reduce, or add, or adopt any such measures or constitution or by-laws, unless in the opinion of the Teacher of Righteousness (TR), GALHEN MELCHIZEDEK, the matter is necessary to carry out the purposes and objectives of the Essene Assembly of Yahvah, otherwise known as the 'EAY.'"

By: _Galhen Melchizedek_
    GALHEN MELCHIZEDEK, Director,
    Essene Assembly of Yahvah.

## IV. CONSTITUTION.

ARTICLE 1 - ORGANIZATION.

1.1 This sovereign organization shall be known as the "ESSENE ASSEMBLY OF YAHVAH," or "EAY," which means "Children of Light," and can also be called "The People of the Way," and it is a "Sovereign Non-Profit Church," which it's sovereign body constitutes and is so named, be it established by the Teacher of Righteousness (TR) for the Assembly of the Children of Light.

ARTICLE 2 - PURPOSES & OBJECTIVES.

2.1 The purposes and objectives of the EAY shall be to provide charitable, religious, scientific, literary, and educational pursuits to the Children of Light who are incarcerated persons, religious, or non-religious entities. These sovereign purposes and objectives shall include providing religious services to incarcerated persons, associating with other religious and non-religious entities in the general public that share the same religious beliefs, and to protect the rights of incarcerated person's, religious, non-religious entities under the "Religious Land Use and Institutionalized Persons Act (RLUIPA) 42 U.S.C. §2000cc-§§1-5.

2.2 It is the intent and purposes of the EAY to adopt RLUIPA as fully incorporated herein this constitution and it's by-laws, which in the opinion of the TR is necessary to carry out the purposes and objectives of the EAY.

ARTICLE 3 - OFFICE OF THE TEACHER OF RIGHTEOUSNESS.

3.1 The TR Galhen Melchizedek, shall hold office by virtue of this constitution in this one sovereign body in Yahshua, in addition to his other appointments in this sovereign jurisdiction, for and during his "natural life," and no constitutional amendment or by-law shall ever be offered, passed, or enacted contravening the same or in any way curtailing or abridging his term of office, or his powers as TR, and the TR shall preside at all meetings held by this office during his natural life.

3.2 After the TR's natural life, the next TR will be assigned by the TR Galhen Melchizedek to serve as TR of the Children of Light. The TR Galhen Melchizedek may extend the EAY to other WDOC facilities in the State of Washington, the United States, and the in Universe, at his discretion, which can be conducted by "Overseer(s)." It is the intent and purposes to extend the EAY throughout the WDOC, the United States (US), and the Universe. It is also the intent, purpose(s), and objective(s) of the Office of the TR, to preached the Gospel as approved by Yahvah (God), and not as approved by men.

ARTICLE 4 - SOVEREIGN BODY.

4.1 This sovereign body shall be one in Yahshua, and shall be known as the "SOVEREIGN SANCTUARY OF YAHAD" (Unity/Community), and shall be composed of it's Officer(s) and Member(s) as follows:

Teacher of Righteousness (1); Priest(s)(1 to 6), Judge(s)(1 to 6), Overseer(s)(unlimited); Deacon(s)(unlimited); Children of Light (unlimited).

4.2 The TR shall appoint all Priest(s), Judge(s), Overseer(s), Deacon(s), and Member(s) as Children of Light in the EAY. These Officers and Members shall serve at the discretion of the TR in case(s) of misconduct by any Officer(s) or Member(s) of the EAY.

ARTICLE 5 - BY-LAWS.

5.1 The Office of the TR shall form a "SUPREME COUNCIL" that shall be bound by the limit(s) and intent(s) of this constitution, who shall recommend amendments to this constitution and/or by-laws. These by-law(s) and constitutional amendment(s) are subject to the approval of the TR at his discretion. All EAY Member's are bound by this constitution and/or by-laws which the TR shall create.

ARTICLE 6 - MEMBERSHIP.

6.1 all incarcerated persons in WDOC facilities are eligible for membership in the EAY, if they:

Have <u>NO</u> class <u>A</u> infractions for 365 days, <u>NO</u> class <u>B</u> infections for 180 days, <u>NO</u> class <u>C</u> infractions for 90 days, and <u>NO</u> class <u>D</u> infractions for 45 days.

6.2 Repentance for one's sins is followed by a change in behavior. If there is no change in behavior, than there is no evidence that an incarcerated persons repentance is genuine and/or sincere, and is evidence of an improper motive for becoming a EAY member, and a Superintendent has grounds to remove an incarcerated member from the EAY.

6.3 Likewise, a incarcerated EAY member cannot be removed from being a member if in the opinion of the TR, the basis for the removal is RETALIATION for engaging in protected conduct. When an EAY member claims RETALIATION is the basis for having been removed from the EAY, the TR shall conduct an investigation consistent with penological objectives in safety and security, to ascertain the truth of the matter. If it is determined in the TR's opinion that RETALIATION was the basis for removal, a formal request by the Office of the TR will be sent to the Superintendent to allow the EAY member to rejoin the EAY.

6.4 If the Superintendent refuses to allow a EAY member to rejoin the EAY, at the EAY's discretion, and under the DOCTRINE OF ASSOCIATIONAL STANDING, which is incorporated herein this constitution and By-laws, the EAY may file suit on behalf of it's member(s) for reinstatement of the EAY member. Nothing in this constitution and/or by-laws prevents, or shall be interpreted to prevent, obstruct, or prohibit the Superintendent from removing any EAY member for legitimate penological reasons before, during, or pending any legal proceedings.

6.5 Furthermore, the EAY does not expect that an incarcerated person to change his life on a turn of a dime, but if an incarcerated person continues to engage in infractable behavior and/or is using EAY activity to cloak illicit conduct either under criminal laws and/or disciplinary rules and regulations, prison official(s) may appropriately question whether an incarcerated person(s) religiosity is authentic, and except as in §§ 6.3-6.4 above, may be removed from the EAY.

6.6 Additionally, an EAY member(s) can be removed as an EAY member if the incarcerated EAY member(s) abuse his EAY membership in a manner that undermines WDOC's compelling interests in security and discipline, except as in §§6.3-6.4 above. The EAY adopts in it's entirety the United States Supreme Court's decision in Holt v. Hobbs,135 S.ct 853(2015).

ARTICLE 7 - OFFICER(S).

The TR, Priest(s), and Judge(s) shall form a "SUPREME COUNCIL." The Priest(s) and Judge(s) shall serve in the EAY at the discretion of the TR. The Priest(s) and Judge(s) shall form a "SUPREME STATE COUNCIL." Until Priest(s) and Judge(s) and the Sovereign State Council are established, the

TR shall officiate over all the EAY officer(s) and office(s).

7.2 After the Priest(s) and Judge(s) are appointed, they shall recommend to the TR appointments to the Committees established by this constitution and/or by-laws, who shall serve at the TR's discretion.

ARTICLE 8 - MEETING(S) & QUORUM.

8.1 The meeting(s) of the Supreme Council shall consist of the TR, Priest(s), and Judge(s), and the Priest(s) and Judge(s) shall govern the Sovereign State Council. The meeting(s) of the Supreme Council will be held once a year at a time and place determined and designated by the TR. Special and/or emergency meeting(s) can be called by the TR, Priest(s), and Judge(s) at any time.

8.2 The standing Sovereign State Council shall hold a meeting within 80 days prior to the meeting of the Supreme Council, and shall make a report to the Supreme Council. The report shall outline the Sovereign State Council's activities, and request(s) and recommendation(s) to the Supreme Council. A quorum of the Sovereign State Council shall consist of TWO-THIRDS of Overseer(s) and Deacon(s).

8.3 A quorum of the Supreme Council shall conduct the business of the EAY, subject to the approval of the TR, shall be no less than the TR, Priest(s), and Judge(s). All votes of the Supreme Council requires a TWO-THIRDS vote, and ALL TWO-THIRDS votes are subject to VETO by the TR.

8.4 All member(s) of the EAY, "Children of Light," are invited to attend the meeting(s) by the Supreme Council and the Sovereign State Council, as observers and may comment on any subject being discussed, that are subject to the approval of the TR, Priest(s), and Judge(s). Also both the Supreme Council and the Sovereign State Council, may call EAY member(s) to speak on any subject related to the purpose(s) and objective(s) of the EAY. Furthermore, all EAY member(s) may make requests to either the Supreme Council or Sovereign State Council.

ARTICLE 9 - APPOINTMENT(S) & ELECTION(S).

9.1 The TR shall appoint all officer(s) to their office(s) as Priest(s), Judge(s), Overseer(s), and Deacon(s), and they shall serve at the discretion of the TR. The initial appointment(s) and election(s) of Priest(s), Judge(s), Overseer(s), and Deacon(s), shall be appointed to office(s) by the TR.

9.2 The election(s) of Overseer(s) and Deacon(s) shall be by a vote of THREE-FOURTHS of the Children of Light, except with regards to Priest(s) and Judge(s). The TR can VETO the appointments of Overseer(s) and Deacon(s), and the TR can be OVER-RULED by a vote of FOUR-FIFTHS of the Children of Light. All Overseer(s) and Deacon(s) appointed shall be bound by the term(s) of this constitution and/or by-laws.

ART
Constitution & By Laws
Page 6 of 10

ARTICLE 10 - GENERAL FUNDS.

10.1 All funds collected from donations shall be deposited into the "Essene Account," as directed by the TR. Donation(s) to that account shall be used to operate the EAV, provide religious services to prisoners, to defend EAV member(s) under RLUIPA, and to carry out the purpose(s) and objective(s) of the EAV in Article 2 of this constitution and/or by-laws.

10.2 ALL disbursement(s) from the "Essene Account" (EA) shall be at the discretion of the TR, and Shall be approved by the TR. ALL donations and expenditures from the Essene Account (EA) SHALL be recorded in a manner as determined by the TR, and be subject to inspection by any member of the public upon reasonable notice to either the EAV and/or TR.

ARTICLE 11 - MEMBERSHIP DUES.

11.1 No incarcerated person shall be required to pay dues for EAV membership. A incarcerated persons membership is determined by the sincerity of their walk as out-lined in Article 6,§§6.1--6.6, and as out-lined in the Essene Lesson on: "The Call to Repentance," "True Faith," and "Imputed Righteousness."

11.2 All other non-incarcerated member(s) of the EAV are required to make a donation of $180.00 dollars per year as dues, and can make this donation in installments of $15.00 per month, to maintain membership in the EAV. At the discretion of the TR, these donation dues may be reduced by requesting it on the EAV's membership application which requires a showing of financial hardship. A showing of financial hardship can be shown by simply requesting it on the membership application.

ARTICLE 12 - EAV RELIGIOUS BELIEFS & BY-LAWS.

12.1 ALL EAV members believe that Yahvah (God) is the Grand Supreme Sovereign of the Universe who created all things. That Yahshua (Jesus Christ) was Yahvah in the flesh. That Yahshua was brought into this world by His virgin mother Mary. That Yahshua lived a sin-less life. That Yahshua came into this world to die on the cross as atonement for all humanities sins, not just those that people think should be forgiven.

12.2 ALL EAV members believe that us Children of Light who repent, have faith in Yahshua, and are baptized in the name of the Father, Son, and Holy Ghost, shall receive eternal life. That Yahshua will return for his Children of Light at a time no-one knows. That there will be a time of tribulation and a judgment day for sinners. That those who receive eternal life will live forever in heaven with Yahshua.

12.3 ALL EAV members believe and accept their Holy Bible as their By-Laws, to live by on a daily basis, that they are bound by the Holy Bible's

precepts as determined by Yahvah (God), and accept the Holy Bible as a Holy, Pure, and Saving Teaching. That the Holy Bible, and other literature inspired by Yahvah and Yahshua, that is not inconsistent with the Holy Bible, contain(s) all truth for EAV members.

12.4 ALL EAV members believe that attempting to force and/or forcing any EAV member(s) to do anything contrary to their sincerely held religious beliefs in the Holy Bible is an infringement on all EAV members religious rights and religious sovereignty, subject to legal action under RLUIPA, by the EAV.

12.5 All incarcerated persons that accept these truths can become a member in the EAV at the discretion of the TR as out-lined in Article 6, §§6.1--6.6.

12.6 All incarcerated members of the EAV shall observe the Religious Holy Days established by the TR in Article 14 of this constitution and by-laws. These Holy Days are sacred to EAV member(s) and are necessary to all EAV member(s) religious well-being and walk as Children of Light. These Holy Days and requirements are out-lined in the by-laws in the "EAV Essene Religious Practices By-Laws," and are hereby incorporated into this constitution and by-laws, for all intents, purposes, and to carry out the purposes and objectives of the EAV.

ARTICLE 13 - COMMITTEES.

13.1 MEMBERSHIP COMMITTEE - The Sovereign State Council shall form a Membership Committee. This Membership Committee shall create "by-laws" for requesting EAV membership, and making recommendations to the TR for new membership in the EAV.

13.2 PUBLICITY COMMITTEE - The Supreme Council shall form Publicity Committee to interface with the public at large, to publicize EAV functions, and cause goodwill and understanding in the community towards and about the EAV and it's member(s). This generally shall be limited to "TR's gmail," a EAV "Web-cite," "Phone Interviews," interviews on "J-pay," and "Press-Releases" by the TR, or as established by the TR.

13.3 SCIENTIFIC COMMUNITY - The Overseers shall form a Scientific Committee, and will be responsible for creating by-laws for assessing, recording, and providing reports on the effort(s) and effect(s) of the EAV on incarcerated member(s) lives, to the Supreme Council, or as directed by the TR.

13.4 CHARITABLE COMMITTEE - The Deacon(s) shall form a Charitable Committee to plan religious events of the EAV. The Charitable Committee shall also create "By-Laws" for requesting disbursements from the EA to the TR and Supreme Council, to provide for religious services to prisoners at other WDOC facilities. The Charitable Committee shall also plan Holy Day events.

13.5 LITERARY COMMITTEE - The Supreme Council shall form a Literary Committee, and be responsible for establishing "By-Laws" to govern procedures for providing literature to the public and EAV members, with regards to the "Pneumatology," "Christology," "Soteriology," "Theology," "Hamartialogy," "Eschatology," "Bibliology," "Angelology," "Anthropology," and "Ecclesiology," beliefs of the EAV and it's member(s), and publish such beliefs as established and authorized by the TR. The Literary Committee shall publish this Constitution and By-laws, and the By-laws of each committee as directed and authorized by the TR.

13.6 OPERATIONAL COMMITTEE - The Priests and Judges shall form a Operational Committee and will be responsible to establish the criteria, procedures, and By-laws to govern the operations of the EAV, and make a report to the TR for his authorization and approval.

13.7 REPORTS - All committee's will share all reports with one-another, and simple forms shall be created by each committee and submitted to the TR for his authorization and approval. All committee's shall make a request by report to amend or adopt committee forms, to the TR.

13.8 All committee's shall assist the Publicity Committee in providing information for the EAV Web-Cite that the General Public can access. All by-laws shall be available on the EAV Web-Cite as determined, authorized, and approved by the TR.

13.9 Until all committees are fully in operation, the TR shall govern all committees and _may_ (discretionary) establish by-laws required in this Article to temporarily govern such committees, which committees as they become operational shall adopt, amend, or recommend, to conform with there duties, any by-laws established by the TR, subject to the TR's authorization and approval.

ARTICLE 14 - HOLY DAYS & RELIGIOUS EVENTS.

14.1 The following are mandated Holy Days, Religious Events, and Festivals that are followed by EAV members:

1. Passover,(Bthulah 7-20 = Sept. 5-20);
2. Feast of Unleavened Bread, (Beth. 14 = Sept. 5th);
3. Waiving of the Omer, (Beth. 21 = Sept. 12th);
4. Yahshua's Birthady, (Mozaniam 5th = Sept. 27th);
5. Pentecost, (Akrab 9th = Nov. 1st);
6. New Wine Festival, (Gedi 3rd = Jan. 25);
7. New Oil Festival, (Deli 22nd = Feb. 13th);
8. Feast of Trumpets/Ten days of Awe, (Dagim 1st-10th = Feb. 23rd-Mar. 3rd, may very do to leep year);
9. Day of Atonement, (Dagim 10th = Mar. 3rd, may very do to leep year);
10. Feast of Tabernacles, (Dagim 15th-21st = Mar. 9th-15th);
11. New Wood Festival, (Arieh 13th-20th = Aug. 6-13).

14.2 These Holy Days, Religious Events, Fests, and Festivals are mandatory for all EAY members and incarcerated EAY members, and no EAY member shall be required to work during these events. The "Essene Religious Practice By-Laws" are incorporated herein, in full for all intents, purposes, and objectives of the EAY, and shall not be subject to change, except by the TR who may add religious events as necessary to carry out the intent, purposes, and objectives of the EAY.

14.3 From sun-set Friday to sun-set Saturday shall be a SABBATH for all EAY members, and no EAY member shall be required to work on this Holy Day of Rest. ALL EAY members may at their discretion wear a head covering that is "White" the represents Yahshua's spotless character and "unity" with the Father, Son, and Holy Ghost (Spirit).

ARTICLE 15 - TRANSPARENCY & CONFIDENTIALITY.

15.1 The EAY SHALL (non-discretionary) provide ABSOLUTE TRANSPARENCY to the GENERAL PUBLIC and MEMBER(S) of the EAY regarding the amount of donations received and the amount of expenditures DISBURSED by the EAY, at any time with reasonable notice to either the EAY or the TR.

15.2 Subsection 15.1 of this Article, in this Constitution and By-Laws, SHALL NEVER BE SUBJECT TO AMENDMENT, or to CHANGE, WHAT-SO-EVER, by either the TR, Supreme Council, Sovereign State Council, Committee(s), or any member (or members) of the EAY.

15.3 The EAY will protect the identity of any "Entity," "Person," "Non-religious," or "Religious" entities who donate to the EAY, and wishes to remain anonymous, including in litigation, unless ordered by a Court of Competent Jurisdiction.

LET IT BE ORDAINED and ESTABLISHED by GALHEN MELCHIZEDEK by the AUTHORITY and POWER invested in him by the GRAND SUPREME SOVEREIGN OF THE UNIVERSE, this CONSTITUTION, BY-LAWS, and ARTICLES be effective IMMEDIATELY this FIRST DAY OF BETHULAH in the year of our LORD 7517. FURTHERMORE, LET THE SAME BE ORDAINED and ENACTED by GALHEN MELCHIZEDEK, Director of the ESSENE ASSEMBLY OF YAHVAH, by the AUTHORITY and POWER invested in him by the GRAND SUPREME SOVEREIGN OF THE UNIVERSE.

*Galhen Melchizedek*
GALHEN MELCHIZEDEK, Director
Essene Assembly of Yahvah

///
///
///
///
///

Constitution & By Laws

Page 10 of 10

# ATTACHMENT 4

ATTACHMENT - 4

# THE ESSENE LESSON ON:

Bibliology

## I. THE WORD OF GOD.

It is very important for a babe in Christ to start his or her walk right. There are many denominations who claim to know the true teachings of the New Testament, and some of these so-called Christian denominations also claim to be the true embodyment of Christ. The purpose of this article is to look at scripture to find out what is the Word of God.

A. The Bible Is The Inspired Word of God.

Second Timothy 3:16-17 says: "All scripture is given by inspiration of God, and is profitable for doctrine, for reproof, for correction for instruction in righteousness: That the man of God may be perfect, throughly furnished unto all good works." many who call themselves Christians try to use verse 16 to apply to others. Thats not what this verse should be used for, rather it should be used to judge one's self, not others.

The Holy Ghost exerted his supernatural influence upon the writers of the Bible, just as he will exert his

The Word of God

Page 1 of 6

60